**Lonnie Wayne BROWN and Randy Carroll Wright, Appellants,**

v.

**The STATE of Oklahoma, Appellee.**

**Nos. M–75–653, M–75–654.**

Court of Criminal Appeals of Oklahoma.

Feb. 24, 1976.

Eugene Carr, Carr & Carr, Tulsa, for appellant Brown.

Carl A. Back, Tulsa, for appellant Wright.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee. appellee.

## OPINION

BLISS, Judge:

The appellants, Lonnie Wayne Brown and Randy Carroll Wright, hereinafter referred to as defendants, were jointly tried before the trial court in a non-jury trial and adjudged guilty of the crime of Tampering With a Vehicle, 47 O.S.1971, § 4–104(a) in the District Court of Tulsa County. Punishment was assessed by the trial court at a term of one (1) year in the county jail for the defendant Brown and a one (1) year suspended sentence for the defendant Wright. From their respective judgment and sentence each defendant has perfected his individual appeal. Said appeals are consolidated for the purpose of this opinion.

Briefly stated, the evidence adduced at trial is as follows: Kevin Vire testified that on the evening of January 26, 1975, at approximately 8:00 P.M. he was returning home from his girlfriend's house, via East 21st Street in Tulsa, Oklahoma, when he noticed several cars driving around the lot behind the Fairway Auto Mall, where his father had a number of wrecked cars parked. Becoming suspicious, he proceeded home and advised his father of the activity. They immediately returned to the scene where they pulled in behind Fairway Auto Mall. From this position they watched as a blue Oldsmobile, earlier observed in the area by Kevin, came onto the vacant lot and parked behind a wrecked 1968 Pontiac GTO. Two men got out of the blue Cutlass and approached the GTO. Defendant Brown, equipped with tools, went to the front of the car and raised the hood while defendant Wright opened the car door and entered on the driver's side. Brown was leaning over the motor with his hand on the carburetor and Wright was lying across the front seat with his legs outside the car when Kevin's father, armed with a shotgun, confronted the two (2) defendants. Kevin Vire then left and called police.

The State's second witness was Gene Vire, father of Kevin Vire, who testified that since 1969 he had been in the business of repairing and selling used automobiles and that on the night in question he had approximately seven wrecked cars stored behind Fairway Auto Mall, including the GTO. He further testified that he and Kevin first observed defendants' blue Cutlass when he and his son returned to the area. It was sitting stationary with its lights on a short distance from them and once they proceeded to exit onto another street the suspicious car also began to move. Vire and his son circled the Fairway Auto Mall and, having extinguished their lights, stopped behind the building. There they caught sight of the other car's lights as it entered a side road, made a U-turn, came back across the vacant lot, and parked directly behind the GTO. Defendant Brown emerged from the car with a pair of waterpump pliers and channel locks in his hand. The remainder of his testimony was essentially the same as his son's.

On cross-examination, the witness stated that the lot was to some extent illuminated by the surrounding business lights and that the hood of the GTO was sprung and normally stood open on one end two or three inches. Consequently, the latch was not engaged when defendant Brown raised the

hood. The witness also stated that neither defendant had time to remove anything from the automobile or loosen any bolts before he approached them with the shotgun. The State then rested.

The defendant Brown, testifying in his own behalf, stated that on the 21st day of January, 1975, he went to the Fairway Auto Mall to buy parts for a 1968 GTO he had been rebuilding. While there, another customer overheard his conversation with a store clerk concerning the parts he needed and informed Brown that the week before he had wrecked his own 1968 GTO and had it towed in behind Fairway. This individual agreed to sell Brown the carburetor, backpads for the windshield and a glove compartment lid for $50.00. Brown stated that after they walked outside and looked at the wrecked GTO from a distance the individual wrote him a bill of sale on the back of a Fairway receipt. The bill of sale was admitted into evidence. Brown did not remove the parts at that time because he was not dressed in work clothes and had no tools with him. Consequently, five days elapsed before he was able to return. During this time, he worked on other vehicles, including a "good time van" for his co-defendant, Randy Wright. Sunday, January 26, 1975, while working on the van, Brown asked Wright and Kenny Wright, another friend, to go with him to pick up the carburetor he had purchased earlier. Kenny Wright had other plans and defendant Wright and Brown went to get the parts off the GTO. They took Brown's Cutlass and proceeded directly to the vacant lot. The witness testified that he walked up to the GTO, leaned over the engine, the hood being raised, and then heard a clicking sound behind him, whereupon Gene Vire appeared with the shotgun. On cross-examination, Brown stated that he had previously been convicted of Assault With a Deadly Weapon, Assault, and Rape.

Kenny Wright then testified that he was a friend of defendant Wright. During the afternoon of the 26th, while working on defendant Wright's van, Brown asked them to help pick up a carburetor he had purchased. Kenny had other plans and did not help.

Defendant Wright then testified in his own behalf stating that he was nineteen years old and had become acquainted with Brown when he helped get one of Wright's vehicles in running condition. His testimony was essentially the same as Brown's. He stated that they did not cruise the area but drove directly to the 1968 GTO, and had no opportunity to remove the carburetor before Gene Vire stopped them. On cross-examination, Wright testified he had no idea that there was any question as to Brown's ownership of the carburetor.

■ The defendants' first assignment of error urges that the evidence presented at trial by the State was insufficient to sustain a conviction for tampering with a motor vehicle pursuant to 47 O.S.1971, § 4–104(a).

Section 4–104(a) reads as follows:

"A person, who, with intent and without right to do so, injures or tampers with any vehicle or in any other manner damages any part or portion of said vehicle or any accessories, appurtenance or attachments thereto is guilty of a misdemeanor."

In *Taylor v. State,* Okl.Cr., 377 P.2d 508, this Court, in considering the legislative history of § 4–104(a), held as follows:

"Title 47 O.S.A. § 4–104(a) is based upon Section 34(a) of the Uniform Motor Vehicle Certificate of Title and Anti-theft Act. In 1956, the National Safety Council included all of the uniform acts pertaining to motor vehicles in a pamphlet denominated 'Uniform Vehicle Code'. This pamphlet included in a separate chapter the provisions relating to theft under a sub-division denominated 'Anti-theft Laws', pertinent section being 4–104(a). Both sections 34(a) of the

Uniform Anti-theft Law and Section 4–104(a) are worded identically as follows:

'A person, who, with intent and without right to do so, damages or removes any of its parts or components is guilty of a misdemeanor.'

Under the Uniform Anti-theft Law, the damaging of an automobile or any part of the auto, constituted a misdemeanor, *whereas the Oklahoma Legislature, by trying to make the act more comprehensive by including the words 'tamper or injure' limited damage to a part or portion of the vehicle, but not to the whole.*

After reviewing these pertinent facts, and reading the complete chapter, it is clear that the Legislature intended that this sub-section be for the purpose of *closing all loop-holes relating to Larceny of Automobiles.*

It is evident this law was designed to establish criminal liability in cases of stealing hub-caps, tires, carburetors, spark plugs, etc., or any other tampering with automobiles.

NO OTHER EXTENSION OF THE LAW INTO OTHER AREAS WAS CONTEMPLATED NOR WAS IT INTENDED." (Emphases added.)

The State argues that "tampering" should be construed to include a trespass upon a vehicle. As stated in *Taylor,* supra., we are of the opinion that "tamper" means more than a simple trespass. "Tamper" in § 4–104(a), means an unauthorized physical alteration or change of a part or portion of a vehicle.

■ In the instant case, it is apparent from the testimony presented by both the State and the defense that both defendants were apprehended before either could loosen a bolt or make any unauthorized physical alteration of the vehicle. Therefore, the State failed to present a prima facie case of the crime charged.

■ An examination of the record indicates, however, that the State did present a prima facie case of attempted tampering with a motor vehicle, and the trial court would have been justified in so finding.

■ It should be further noted that each defendant was sentenced to a term of one year in the county jail; evidently, pursuant to the provisions of 21 O.S.1971, § 10, the general punishment statute for misdemeanors, which reads as follows:

"Except in cases where a different punishment is prescribed by this chapter or by some existing provisions of law, every offense declared to be a misdemeanor is punishable by imprisonment in the county jail not exceeding one year or by a fine not exceeding five hundred dollars, or both such fine and imprisonment."

However, 47 O.S.1971, § 17–101(c), a statute specifically prescribing punishment for violations of the Oklahoma Highway Safety Code provides as follows, to-wit:

"Unless another penalty is in this act or by the laws of this state provided, every person convicted of a misdemeanor for the violation of any other provision of this act shall be punished by a fine of not more than Five Hundred Dollars ($500.00), or by imprisonment for not more than six months, or by both such fine and imprisonment."

It is our opinion that the specific provisions of § 17–101 prevail over the general provisions of 21 O.S.1971, § 10. The trial court erred in sentencing either defendant to more than six months imprisonment in the county jail.

It is therefore the opinion of this Court that the judgments and sentences appealed from by both defendants should be and the same are hereby *reversed,* and the cause is *remanded* for a new trial in conformance with the terms and tenor of this opinion.